**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STEVEN R. WILKERSON | : | |
| Plaintiff | : | |
| v | : | Civil Action No. JFM-05-1270 |
| CHAPLAIN BEITZEL, *et al.* | : | |
| Defendants | : | |

o0o

## MEMORANDUM

This civil rights action, filed on May 9, 2005, alleges that defendants are engaging in discriminatory practices regarding Jewish inmates at Western Correctional Institution (WCI). Paper No. 1. Now pending in the case is defendants' motion to dismiss or in the alternative for summary judgment. Paper No. 12. Plaintiff has filed a response in opposition to the motion. Paper No. 16. Upon review of the papers filed, this court finds a hearing in this matter unnecessary. Local Rule 105.6 (D. Md. 2004). For the reasons set forth more fully below, defendants' motion, construed as a motion for summary judgment, shall be granted.

## Background

Plaintiff, a Jewish inmate, alleges he has repeatedly requested kosher meals from prison officials, but his requests have been denied. Paper No. 1 at p. 3. He claims that the Lacto-Ovo Vegetarian diet option currently available in Division of Correction (DOC) facilities, including WCI, does not meet the criteria for a kosher Jewish diet. *Id*. He also claims that the laws of Kashurut are categorically binding on persons of the Jewish faith and require consumption of a kosher diet. *Id*.

He further alleges that his requests for Jewish worship services and access to a Jewish Rabbi have been denied, as well as his requests for a Torah, Jewish writings, worship candles, and other worship materials. *Id*. at pp. 3– 4. He claims that Chaplain Bietzel openly promotes his own

Christian religion as the religion of choice for WCI. *Id*. at p. 4. Specifically, he claims that on protective custody, where plaintiff is housed, Christian worship services are provided, but no worship services are provided for the Jewish inmates also assigned to that tier. *Id*.

Plaintiff also claims that Jewish inmates are treated differently from other religious groups at WCI. He states that other religious groups are provided special accommodations that are not available to Jewish inmates. *Id*. He claims that Christians are provided Bibles, study groups, worship services, volunteers from outside, communion services and rituals, and priests. *Id*. He alleges that the warden and the chaplain encourage Christian proselytizing and evangelism among staff and inmates. *Id*. Plaintiff also claims that Christian programming is favored in the use of media, newsletters and other publications. *Id*. He asserts that the provision of special meals to Islamic prisoners during Ramadan establishes that provision of special meals does not cause an insurmountable security problem. *Id*. In addition he claims that DOC officials accommodate inmates in the "American Indian Nation" by supplying smoking paraphernalia, tobacco, and a place for an open fire pit. *Id*.

Defendants assert that they cannot, without significant cost, provide kosher meals to Jewish inmates. Paper No. 12 at Ex. 4, p. 2. They explain that favoritism, perceived or real, for any one religious group encourages litigation against the DOC and that is part of the reason the current dietary options were adopted. *Id*. at p. 1. Specifically, a lawsuit was filed wherein inmates of the Moorish Science Temple of America demanded that the DOC provide ritually slaughtered meat so they could observe Islamic dietary requirements. *Id*.[1] In part the Islamic inmates cited the fact that, at that time, kosher meals were being provided to Jewish inmates. *Id*. The DOC's response to the lawsuit was implementation of the lacto-ovo vegetarian diet which uses no meat. *Id*. Prior to

---

[1] *See Calhoun-el, et al. v. Robinson, et al.*, Civil Action No. K-89-547 (D. Md. 1993); *Robinson-Bey v. Robinson, et al.*, Civil Action No. K-89-548 (D. Md. 1993).

implementation of the vegetarian diet option, the DOC eliminated the use of all pork and any food containing pork or its derivatives from its food selections. *Id*. Defendants assert that the current system satisfies a broad range of dietary needs; permits use of a uniform approach that does not interfere with "batch processing;" and does not require personalization of meal programs with the concomitant exorbitant costs. *Id*. In short, there are no religious diets currently provided by the DOC.[2]

Defendants assert that certain religious groups observe holy days that require consumption of food as a part of the observance, while others do not. *Id*. at p. 3. Specifically, the Jewish and Islamic religions have holy days requiring consumption of food, while Christians do not observe holy days in that manner. *Id*. Complaints have been lodged in the past by Christian inmates regarding the perceived preferential treatment given to Jewish and Islamic inmates. *Id*. In order to quell the animosity created, some wardens permit all religious groups represented in the prison "to have one holy day or special program with a meal." *Id*. Yet even this accommodation has provoked complaints from Muslim inmates who claim the practice detracts from the special quality of the feast provided to them. *Id*.

With respect to religious services for Jewish inmates at WCI, defendants allege that a lack of volunteers has prevented establishment of regular services. *Id*. at Ex. 6. Efforts to recruit volunteers for that purpose have been ongoing for more than two years. *Id*. In addition, efforts have been made to obtain donated yarmulkes, prayer shawls and torahs. *Id*. at Ex. 7 and 8. To the extent that plaintiff alleges there are Jewish services provided in general population at WCI, it appears that

---

[2] Defendants admit that the current dietary program does not meet the requirements of all religious dietary requirements. For example, they point out that some Rastafarian, Buddhist, Wiccan and Seventh-Day Adventist inmates are vegan vegetarians and the DOC's lacto-ovo regime does not meet the religious dietary requirements for these groups. Paper No. 12 at Ex. 4, p. 2.

those services are led by another inmate.[3]  *Id*. at Ex. 8.  Defendants' efforts to procure regular volunteers to lead Jewish services at WCI have been unsuccessful.  *Id*. at Ex. 7.

## **Standard of Review**

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 437 (4th Cir. 1998).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment

---

[3] Defendants do not, however, directly address the allegation that Jewish religious services are provided to general population inmates but are not provided to protective custody inmates.

with an affidavit or other similar evidence. *See Anderson*, 477 U.S. at 256.

In *Celotex*, the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex*, 477 U.S. at 324. However, "'a mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## Analysis

### Threshold Issues

The Prison Litigation Reform Act ["PLRA"] generally requires a prisoner plaintiff to exhaust administrative remedies before filing suit in federal court. 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532

(2002).  Thus, the exhaustion provision plainly extends to plaintiff's allegations of religious discrimination.

"[A]n inmate's failure to exhaust his administrative remedies must be viewed as an affirmative defense that should be pleaded or otherwise properly raised by the defendant." *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F. 3d 674, 681 (4th Cir. 2005).  Defendants in the instant case have properly raised the exhaustion issue and plaintiff has responded accordingly.  Defendants contend that plaintiff has not exhausted administrative remedies with respect to the issues raised in this complaint.  Paper No. 12 at p. 2.  Specifically, defendants claim that plaintiff's administrative remedy procedure requests ("ARPs") addressing his complaints that he was not being provided with kosher meals and that no religious services were being provided to inmates on protective custody were not properly appealed, and were administratively dismissed at the institutional level as untimely because they were filed more than thirty days after plaintiff's arrival at WCI.[4]  *Id*. at Ex. 1 and 2.

Plaintiff has submitted, as an exhibit, copies of the appeal responses from the Commissioner of Correction with respect to these ARPs.  Paper No. 16 at Ex. 3 and 5.  The Commissioner of Correction affirmed the administrative dismissal of the ARPs by the institutional coordinator.  *Id*.  Plaintiff also includes a carbon copy of two appeals filed with the Executive Director of the Inmate Grievance Office.[5]  *Id*. at Ex. 11 and 12.  Upon review of the evidence submitted, I find that plaintiff has exhausted his administrative remedies and the complaint shall be addressed on its merits.

---

[4] This court notes that the rationale provided for the administrative dismissal of plaintiff's ARPs borders on sophistry.  According to the rationale provided, any complaint regarding a prison policy must be raised by an inmate within 30 days of his arrival at the institution or it is time-barred, without regard to the fact that the complaint is ongoing.  At a minimum, the administrative response discourages informal attempts to address complaints; at worst, it renders the ARP system meaningless.

[5] Defendants claim there was no appeal filed with the Inmate Grievance Office.  Paper No. 12 at Ex. 3, p. 3.

6

**Constitutional Claims**

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972).  That retained right is not unfettered.  Prison restrictions that impact on the free exercise of religion, but are related to legitimate penological objectives do not run afoul of the constitution.  *See Turner v. Safely*, 482 U.S. 78, 89– 91 (1987).  The test to determine if the restrictions are justified requires examination of whether or not there is a rational relation between the asserted governmental interest and the regulation in question.  In addition, this court must examine: whether there are alternative means of exercising the right asserted; whether accommodation of the right will impact on the orderly operations of the prison; and whether readily available alternatives to the regulation would be less restrictive.

An additional consideration in this case is the standard provided by the Religious Land Use and Institutionalized Persons Act (RLUIPA).  The act provides in part that:

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a) (2000).

Defendants have presented considerable evidence in support of the current practice not to provide meal plans tailored to any particular religious practice.  Paper No. 12 at Ex. 4.  The

difficulties experienced, including additional costs and creation of perceived favoritism between religious groups, are legitimate compelling interests that override the burden placed on plaintiff's ability to follow a kosher diet. There is no requirement for accommodation of religious observances to take precedence over institutional security concerns. *See Cutter v. Wilkinson*, __ U.S. __, __, 125 S. Ct. 2113, 2122 (2005). The meal plans currently available are neutral in religious requirements, and are the least restrictive means available to advance the compelling interest in avoiding perceived favoritism between religious groups. *See e.g., Reimann v. Murphy,* 897 F.Supp. 398, 402-403 (E.D.Wis.1995) (exclusion of racist literature advocating violence is least restrictive means of furthering the compelling state interest in preventing prison violence); *George v. Sullivan,* 896 F.Supp. 895, 898 (W.D.Wis.1995) (same). Accordingly, defendants are entitled to summary judgment on plaintiff's claim concerning the failure to provide kosher meals.

Plaintiff's claim concerning the failure to provide Jewish religious services to protective custody inmates while Christian services are provided to the same inmates is an equal protection claim. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U. S. 432, 439 (1985) (citation omitted). The complaint asserts that with regard to protective custody inmates Christians and Jews are treated differently. Paper No. 1 at p. 4. Specifically, plaintiff claims that Christian worship services are provided to protective custody inmates on a regular basis, while Jewish services are not. *Id*. Plaintiff appears to amend the claim in his response in opposition to defendants' motion for summary judgment to also include a claim that Jewish inmates on protective custody are treated differently from Jewish inmates in general population. Paper No. 16 at p. 11. Plaintiff submits an affidavit from another inmate on protective custody who claims that during his assignment to general population, he attended Jewish religious services which included access to

prayer shawls, yarmulkes, and prayer books. *Id*. at p. 12.

The alleged discrimination, whether it is between Christians and Jews on protective custody, or between Jews assigned to general population verses Jews assigned protective custody, is the result of a lack of resources. *See* Paper No. 12 at Ex. 6 – 8. There is no evidence of a policy in place which adversely effects Jewish inmates, nor is there evidence of intentional discrimination by defendants. To the contrary, efforts to arrange for outside volunteers to lead Jewish services have been ongoing. *Id.* Absent evidence that the alleged discrimination is intentional or is pursuant to a policy with discriminatory impact, there is no equal protection claim.

To the extent that Jewish inmates in general population attend services that are facilitated by another inmate, security concerns prohibit the same practice with respect to protective custody inmates.[6] *Id*. at Ex. 7. Under Division of Correction Directive 100-142.III.J, general population inmates are not permitted access to the protective custody housing area unless they are directly supervised by staff. The long history of staff shortages in Maryland correctional facilities is well known to the court. So long as the restrictions placed on protective custody inmates do not jeopardize the health of the inmates subject to them and there is a rational relationship between those restrictions and the need for protection of the inmates, equal protection is not violated. *Taylor v. Rogers*, 781 F. 2d 1047, 1050 (4th Cir. 1986).

Defendants deny plaintiff's claim that Christianity is actively promoted by prison staff. Paper No. 12 at Ex. 6. Plaintiff, in an apparent attempt to refute that denial,[7] includes with his response in opposition to summary judgment written Catholic devotional materials, a rosary and a

---

[6] *See* Paper No. 12 at Ex. 8, identifying Philip Taylor as an inmate who leads Jewish studies; *see also* Paper No. 16 at p. 12, naming Philip Taylor with respect to general population Jewish services.

[7] Plaintiff provides no explanation regarding the submission of these materials. The court notes, however, that the dates of the publications are May through June of 2005, approximately six months after plaintiff informed prison officials that he is Jewish. Paper No. 12 at Ex. 5.

scapula. Paper No. 16 at Ex. C-1-A.  Because plaintiff's original declared religious preference was Roman Catholic, the submitted exhibit is not probative evidence that Christian religions are promoted at WCI.  *See* Paper No. 12 at Ex. 10.  In addition, plaintiff has failed to forecast other evidence probative of the claim and, accordingly, the claim must fail.

Having determined that defendants are entitled to summary judgment on the claims presented, the motion shall be granted and judgment entered in their favor by separate order which follows.

| | |
|---|---|
| <u>November 10, 2005</u><br>Date | <u>/s/</u><br>J. Frederick Motz<br>United States District Judge |